COURT OF APPEALS

EIGHTH DISTRICT OF
TEXAS

EL PASO, TEXAS

 

 


 
 
  
 JIMMIE McMORRIS,
  
                            
 Appellant,
  
 v.
  
 THE STATE OF TEXAS,
  
                            
 Appellee.
 
 
  
   '
     
   '
     
   '
     
   '
     
   '
     
  '
 
  
 
 
  
  
                   No. 08-11-00171-CR
  
 Appeal from the
  
 371st
 Judicial District Court 
  
 of Tarrant
 County, Texas 
  
 (TC# 1177999D) 
  
 
 


 

                                                                  O
P I N I O N

Appellant Jimmie McMorris (“McMorris”)
appeals his conviction of two counts of sexual assault, for which he was
sentenced to seven years’ confinement.  In
three issues, McMorris argues that the trial court abused its discretion:  (1) by allowing the State to present, during
rebuttal, evidence of alleged extraneous offenses in violation of Rule 404(b);
(2) by delivering a supplemental jury instruction that he contends coerced a
verdict and by denying his Motion for Mistrial related to the supplemental
instruction; and (3) by denying his Motion for New Trial.  We affirm.[1]

BACKGROUND

            McMorris
owned and operated a cleaning business, JMAC Corp. Services, Inc. (“JMAC”).
American Eurocoptor contracted with JMAC to provide cleaning services at its Grand
Prairie, Texas, location.

            The
complainant, Maria Rodriguez (“Rodriguez”), entered the United States illegally
in September of 2001.  In October or
November of 2008, she began working for JMAC under the name Norma Alvarez as
part of the American Eurocoptor cleaning crew. 
As time passed, Rodriguez and McMorris began to have more contact with
each other, while McMorris was supervising her work.  McMorris contends that Rodriguez developed a
crush on him.  Rodriguez testified that
McMorris acted in ways that made her feel uncomfortable, including caressing
her hair and offering her money, and on one occasion saying “please, please”
and pointing at her body.  While these
situations made Rodriquez feel uncomfortable, she never made a complaint
against McMorris because she did not think he would do anything to her at
work.  Rodriguez thought about leaving
her job, but since her husband was unemployed she stayed.

            According
to McMorris, on the afternoon of September 23, 2009, he was at the Arlington
Park Apartments to purchase some food, an African dish called “can can,” from
some of his wife’s friends who make and sell the dish out of their apartment.  McMorris knew that Rodriguez lived at the
Arlington Park Apartments and as he was leaving, he saw Rodriguez.

            They
gestured towards each other, and Rodriguez followed McMorris in her vehicle to
a parking spot that was hidden by some trees. 
McMorris testified that Rodriguez got into his vehicle, where they
engaged in consensual sex.

            Rodriguez
testified that on September 23, 2009, she went to work around 5 p.m. and signed
in at the guard shack.  The usual
procedure was that a security guard would accompany her when she cleaned the
presidential suite offices and accounting area, but after she was finished in
those areas there was no guard accompanying her.

            While
Rodriguez was cleaning the unsecured office area, McMorris exited the kitchen
area and asked her for a trash bag. 
After he placed the bag in a trash can, he called Rodriguez to the
restroom.  In the restroom, McMorris
pointed to the soap, and Rodriguez told him that she had not yet cleaned the
area.  At approximately 9:15 p.m., when
McMorris and Rodriguez were about to leave the restroom, McMorris blocked the
doorway.  Rodriguez testified that
McMorris grabbed her by the arms, pulled her towards him, and told her to kiss
him.  Frightened, Rodriguez told him “no;”
at which point McMorris pulled down her blouse and grabbed and kissed one of
her breasts.  Rodriguez kept saying “no,”
while McMorris would say “yes.”  McMorris
then put his hands down Rodriguez’s pants and inserted his fingers into her
vagina while she tried to back away.

            McMorris
then took Rodriguez by the hand, pushed her into a restroom stall and closed
the door.  Rodriguez testified that McMorris
grabbed her hand, turned her around, pulled down her clothing, then inserted
his penis into her vagina for four or five minutes and ejaculated.  He then said “thank you” and left.

            Rodriguez
testified that after McMorris left she felt lost and dazed.  She remained in the restroom, cleaned herself
and cried.  When she left the restroom
she ran into a co-worker.  Feeling
ashamed, she did not tell the co-worker what happened, but did tell him that
she was not going to clean anymore that night, and the co-worker went with her
to drop off her cart and take out the trash.

            On
her way out, Rodriguez saw another co-worker, Justina Grimaldo.  Rodriguez told Grimaldo that McMorris “had
taken her by force, had abused her, and had raped her,” in one of the
restrooms.  Grimaldo told Rodriguez to
make a report but Rodriguez did not do so because she was afraid her husband
would leave her and because she was using false documents to remain in the
United States.

Rodriguez went
home after talking to Grimaldo. 
Rodriguez bathed and lay down on the living room sofa, but could not go
to sleep.  She testified that she was in
pain from what McMorris had done to her. 
The next day, Rodriguez had intercourse with her husband.  Throughout the day she was anxious, but when
her husband asked what was wrong and why she was crying, Rodriguez told him it
was nothing.

When Rodriguez
went to work the next evening, she told co-worker Jessica Hinojosa that
McMorris had sexually assaulted her in the restroom and that she had been
unable to defend herself.  Hinojosa told
Rodriguez that they should contact the police, but Rodriguez was afraid and did
not want to tell her husband what had happened. 
Rodriguez left work after telling Grimaldo she no longer felt
comfortable being there and would not return. 
Rodriguez returned home and told her husband she would not be going back
to work.  When he insisted on the reason,
Rodriguez began crying and told him that McMorris had sexually assaulted
her.  Her husband told her that she
needed to go to the police, and she agreed.

Meanwhile,
Grimaldo told an American Eurocoptor employee that McMorris raped Rodriguez at
work the night before.  The employee
informed a security guard, who then called the police.  Grimaldo called Rodriguez and convinced her
to return to American Eurocoptor to talk to the police.  Rodriguez returned and told a Grand Prairie
police officer what happened.  After
Rodriguez made her statement, McMorris was issued a criminal trespass warning
and escorted from the premises.  A police
officer accompanied Rodriguez to her house where she gave the officer two pairs
of underwear, one of which she wore the day McMorris assaulted her.  Rodriguez then went to the hospital for a
sexual assault examination.  DNA testing
on the underwear concluded that neither McMorris nor Rodriguez’s husband could
be excluded as possible contributors of the male DNA from two different
individuals.

McMorris was
indicted on two counts of sexual assault. 
Following a six-day trial, the jury found McMorris guilty of both counts.
 He was sentenced to seven years
confinement in the Institutional Division of the Texas Department of Criminal
Justice.  McMorris timely appealed.

Following the
trial and after McMorris filed his notice of appeal, juror C.F. sent a letter
to the court, informing the court that during deliberations, another juror
revealed that she had been the victim of a sexual assault, but had chosen not
to disclose this during voir dire.  The
juror allegedly told “the entire story” of how she had been assaulted.  McMorris filed a Motion for New Trial based
on this allegation.  At the hearing on
the Motion for New Trial, juror C.F., who provided the letter and an affidavit,
was unable to appear due to a family emergency. 
The affidavit and letter were entered into evidence without
objection.  No other evidence was offered
by either party.  The State argued, inter alia, that the affidavit was
insufficient pursuant to Rule 606(b) of the Texas Rules of Evidence.  The trial court denied the motion, noting
that the State’s reliance on Rule 606 was “well founded;” there was no clear
evidence about which juror may have made the statements; the question presented
in voir dire was “somewhat vague as to whether a person themselves is sexually
assaulted,” and that a more specific question could have been asked; and under
case law cited by the State, the defense did not exercise due diligence in
asking the questions it specifically wanted answered during voir dire.

DISCUSSION

            In
three issues, McMorris argues that the trial court abused its discretion:  (1) by allowing the State to present, during
rebuttal, evidence of alleged extraneous offenses in violation of Rule 404(b);
(2) by delivering a supplemental jury instruction that he contends coerced a
verdict and by denying his Motion for Mistrial related to the supplemental
instruction; and (3) by denying his Motion for New Trial.

Extraneous
Offenses

            McMorris first contends
that the trial court abused its discretion by allowing the State to present
evidence of extraneous offenses, in violation of Texas Rule of Evidence 404(b),
during rebuttal.  Specifically, McMorris argues
that the court erred when it permitted the State to present evidence from
Araceli Luna (“Luna”).  The State counters
that the testimony was admissible to rebut a defensive theory, to rebut
statements made by McMorris, and even if there was error, it must be
disregarded because it did not have a substantial or injurious effect on the
jury’s verdict.

We will not disturb a trial court’s
evidentiary ruling absent an abuse of discretion.  Winegarner
v. State, 235 S.W.3d 787, 790 (Tex.Crim.App. 2007).  As long as the trial court’s decision is
within the “zone of reasonable disagreement” and was correct under any theory
of law applicable to the case, the decision must be upheld.  Id.

Rule 404(b) of the Texas Rules of Evidence
provides that evidence of other crimes, wrongs, or acts is not admissible “to
prove the character of a person in order to show action in conformity
therewith.”  Tex.R.Evid. 404(b). 
However, such evidence may be admissible for other purposes, and
rebuttal of a defensive theory is one of the permissible purposes under Rule
404(b).  Williams v. State, 301 S.W.3d 675, 687 (Tex.Crim.App. 2009).  By raising a defensive theory, a defendant
opens the door for the State to offer rebuttal testimony regarding an
extraneous offense if the extraneous offense has common characteristics with
the offense for which the defendant is on trial.  Richardson
v. State, 328 S.W.3d 61, 71 (Tex.App.--Fort Worth 2010, pet. ref’d), citing Bell v. State, 620 S.W.2d 116,
126 (Tex.Crim.App. 1980); Jones v. State,
119 S.W.3d 412, 421 (Tex.App.--Fort Worth 2003, no pet.).

Courts have held evidence of an extraneous
offense proper in sexual assault cases to rebut a defensive theory of
fabrication or that the defendant is being framed by the complainant.  See Bass v. State, 270 S.W.3d 557, 563
(Tex.Crim.App. 2008).  In Bass, the Court of Criminal Appeals
noted that “[t]he issue does not necessarily turn on the type of defense
presented, but on whether the extraneous-offense evidence has
noncharacter-conformity relevance by, for example, rebutting a defensive theory
or making less probable defensive evidence that undermines an elemental fact.”  See id.
at n.8.  To be admissible for rebuttal of
a fabrication or “frame-up” defense, “the extraneous misconduct must be at
least similar to the charged one . . . .”  Wheeler
v. State, 67 S.W.3d 879, 887 n.22 (Tex.Crim.App. 2002); see generally Bass, 270 S.W.3d at 562-63.
 The degree of similarity required for
admissibility is not “one of exacting sameness” as is required when extraneous
offense testimony is used to prove a “defendant’s system.”  See
Dennis v. State, 178 S.W.3d 172, 179 (Tex.App.--Houston [1st Dist.] 2005,
pet. ref’d).

During opening statements, counsel for
McMorris told the jury that McMorris and Rodriguez had engaged in consensual
sex.  Counsel asserted that Rodriguez
fabricated a claim of sexual assault in order to get money from McMorris, based
on the fact that she contacted a civil attorney after the alleged assault.  He continued his theory by telling the jury
that Rodriguez believed that McMorris had a lot of money and that “she could
get a piece of the pie . . . .”

On cross-examination, counsel for McMorris
asked Rodriguez whether she had heard rumors that McMorris had given money to
other employees and dated another employee. 
Counsel also asked her about visiting and retaining a civil attorney
seven days after the offense; stated “[Y]ou wanted money from Mr. McMorris,
correct?;” and asked a number of questions designed to make it appear as though
Rodriguez had lied about being sexually assaulted.  Counsel also asked Jessica Hinojosa whether
McMorris had ever made sexual advances towards her or had ever bothered her
when he was alone with her at work; whether Hinojosa ever saw McMorris make
sexual advances or be flirtatious with other female employees; and whether any
other female employees had ever told Hinojosa that McMorris was making sexual advances
or being flirtatious.

McMorris testified that he saw Rodriguez in
her apartment complex’s parking lot where, after picking up dinner from another
apartment in the complex, he motioned to Rodriguez, who followed him to another
parking lot, where they engaged in consensual sex in McMorris’s vehicle.  He testified that he went into the restroom
at work to talk to Rodriguez about filling and changing the soap and paper towel
dispensers, and denied committing any of the acts alleged by Rodriguez.  On cross-examination, McMorris denied
knowing that Rodriguez, or any of his employees, were illegal immigrants.

After the defense rested its case-in-chief,
the State informed the trial court that it intended to call Luna as a rebuttal
witness in order to present evidence of two extraneous offenses.  The State made the following proffer:

Basically,
Your Honor, what Ms. Luna is going to testify to, the first extraneous offense
will be that what the Defendant testified to today, that he did not know any of
his workers were illegal immigrants and did not know that they did not have
papers.  She will testify to the fact that
the Defendant told her, one, to get her sister's papers because she was illegal.  So he had knowledge of the fact that she was
illegal.

Number two, Ms. Luna had an ongoing relationship
with the Defendant.  She was pregnant
with his child, and there were times when he would sexually assault her.  So we would like to go into those specific sexual
assaults.

 

            McMorris objected, and after
hearing the arguments of parties, the trial court overruled McMorris’s
objection.[2]

            Luna testified that she
had worked for McMorris at American Eurocoptor, and that he knew she was in the
country illegally.  McMorris instructed
her to use her sister’s Social Security information so Luna would be permitted
to work.  She testified that from the
time she began working there, McMorris made advances towards her.  On one occasion, McMorris touched her leg and
thigh, and Luna told him it was inappropriate because he was her boss.  On “several” occasions, McMorris took
photographs of her “back part,” which she did not feel was appropriate.  There were occasions where McMorris would
make sexual advances on Luna while she cleaned the restroom.  Luna testified that “he would close the door,
and he would say that Little Jimmie would wake up when I was close to him.”  She explained that “Little Jimmie” referred to
McMorris’s penis and that McMorris wanted her to touch his penis.  Luna and McMorris began dating about six
months after he began making these advances and maintained a good relationship
from the end of 2007 until May 2010.

            Luna responded
affirmatively when the State asked “[w]as there ever a time when - when you
were pregnant when Jimmie forced you to have sex with him when you didn’t want
to?”  Luna gave the following testimony
about the times McMorris forced himself on her:

Q.        [Prosecutor] About how many times would
you say, if you can remember, Jimmie forced you to have sex with him?

 

A.        [Luna] About five times.

 

Q.        I'm not trying to be too graphic, but
could you please tell the jury about these times, if you remember.

 

A.        Yes. 
He would come at night, and he would tell me that he wanted to be with
me, and I would tell him no, because I was hurting.  He never did obey that --

 

[Objection
by McMorris regarding lack of notice overruled]

 

Q.        [Prosecutor] Araceli, if you could - did
you tell Jimmie no during these times?

 

A.        No.

 

Q.        Did you - during these times, did you
want to have - during these times that he forced himself on you, did you want
to have sex with him?

 

A.        No.

 

Q.        Okay. 
Now, Araceli, then how did he force himself on you?

 

A.        He would just use his strength, and he
would get on top of me, and naturally he's stronger than I am.

 

Q.        When - did this happen at your
apartment?

 

A.        Yes.

 

Q.        Did you let him into the apartment, or
did he force his way in?

 

A.        He had a key.  But at one occasion, I put a chain that all
the apartments have, and he broke it and came in.

 

McMorris’s defensive theory at trial was:  (1) that Rodriguez fabricated the sexual
assault in an attempt to obtain money from McMorris; (2) that McMorris and
Rodriguez engaged in consensual sex; and (3) that McMorris was not the kind of
person to make advances on female employees at work.  Luna’s testimony about McMorris’s sexual
advances toward her, specifically in the restroom at American Eurocoptor while
she was employed by JMAC, tended to rebut McMorris’s defensive theory of
fabrication and that he was not the type of person to make such advances.  See
Bass, 270 S.W.3d at 562-63; Daggett
v. State, 187 S.W. 3d 444, 453-54 (Tex.Crim.App. 2005); Wheeler, 67 S.W.3d at 887-88.

Furthermore, the circumstances of McMorris’s
sexual advances against Luna were sufficiently similar to those in the charged
sexual assault against Rodriguez thereby rendering the extraneous offenses
admissible.  Dennis, 178 S.W.3d at 179. 
Both Luna and Rodriguez worked for McMorris’s cleaning business at the
American Eurocoptor facilities; both were illegal immigrants; and McMorris made
unwanted sexual advances toward both women in a bathroom.  All of this evidence was within the zone of
reasonable disagreement, and was admissible for the noncharacter-conformity
purpose of rebutting McMorris’s defensive theories.  We perceive no abuse of discretion.  McMorris’s first issue is overruled.

Allen Charge

            Next, McMorris argues
that the trial court erred by delivering a supplemental Allen charge to the jury which “coerced” a verdict.  He also asserts that the trial court erred by
denying his motion for mistrial, which was based on the supplemental
instruction.  The State argues that
McMorris forfeited his complaints regarding the alleged coercive nature of the Allen charge by failing to timely object
at trial and, in the alternative, that the language of the trial court’s Allen charge was not coercive.

            While courts have
sanctioned the use of an Allen charge
when a jury indicates that it is deadlocked, see Allen v. United States,
164 U.S. 492, 501, 17 S.Ct. 154, 157, 41 L.Ed. 528 (1896); Howard v. State, 941 S.W.2d 102, 123 (Tex.Crim.App. 1996), a trial
court errs if it delivers an Allen
charge which has a coercive effect on jury deliberations.  See
Howard, 941 S.W.2d at 123.

            Here, the jury began its
deliberations at 4:37 p.m. on April 7, 2011, and recessed that evening at 6:05
p.m.  Deliberations resumed the next
morning at 8:34 a.m.  At 11:15 a.m., the
jury sent out a note stating “[w]e the jury cannot come to a consensus in this
case.  The vote stands as of now 10-2.”  The trial court instructed the jury to
continue its deliberations.  At 3 p.m.,
the jury sent out jury note number seven, stating “[w]e are still not in
concurrence.”  Following an exchange
between counsels for both parties and the court where the language of the
proposed Allen charge was discussed,
the trial court gave the jury the following supplemental instruction, to which
McMorris objected:

‘Members of the jury, you are instructed that
in a large proportion of cases, absolute certainty cannot be expected.  Although the verdict must be the verdict of
each individual juror and not a mere acquiescence in the conclusion of other
jurors, each juror should show a proper regard for the opinions of the other
jurors.  You should listen with a
disposition of being convinced to the arguments of the other jurors.  If a large number of jurors are for deciding
the case in one way, those in the minority should consider whether they are
basing their opinion on speculation or guesswork and not on the evidence in the
case.

If this jury finds itself unable to arrive at
a unanimous verdict, it will be necessary for the Court to declare a mistrial
and discharge the jury.  The indictment
will still be pending, and it is reasonable to assume that the case will be
tried again before another jury at some future time.  Any such future jury will be empaneled in the
same way this jury has been empaneled and will likely hear the same evidence
which has been presented to this jury. 
The questions to be determined by that jury will be the same questions
confronting you, and there is no reason to hope that the next jury will find
these questions any easier to decide than you have found them.

With this additional instruction, you are
instructed to continue deliberations in an effort to arrive at a verdict that’s
acceptable to all members of the jury, if you can do so without doing violence
to your conscience.’

 

            The jury resumed its
deliberations at 3:42 p.m., and at 4:56 p.m., McMorris moved for a mistrial
based on the length of time the jury had been deliberating.  The trial court denied McMorris’s motion.

            McMorris argues that the
last sentence of the first paragraph of the Allen
charge was improper:  “[i]f a large
number of jurors are for deciding the case in one way, those in the minority
should consider whether they are basing their opinion on speculation or guesswork
and not on the evidence in the case.” 
McMorris argues that this language impermissibly coerced a verdict and
is a constitutional violation of his right to due process and a fair trial.

            The challenged language
of the Allen charge is identical to
the language challenged in West v. State,
121 S.W.3d 95,108 (Tex.App.--Fort Worth 2003, pet. ref’d).  In fact, the entire first paragraph is
identical in both cases.  West, 121 S.W.3d at 108.  West
held that “[t]he instructions contained in the Allen charge utilized here are consistent with similar instructions
used in Allen charges used throughout
this state and have been held to be noncoercive.” Id. at 109.  The court noted
that:

West
does not point to any specific language that he contends was coercive, and
after reviewing the instruction, we see no language that shows jury coercion
likely occurred.  Specifically, the Allen charge given here does not tell
the jury that one side or the other possesses the superior judgment, nor does
it tell them to distrust their judgment.  Additionally, the trial court carefully
concluded the Allen charge by
instructing the jury that, in any event, it should try to arrive at a verdict
acceptable to all jurors only if it could do so ‘without doing violence to your
conscience.’

 

Id. at 109.

            The Allen charge in this case is supported by the trial court’s
instruction to the jury that “you are instructed to continue deliberations in
an effort to arrive at a verdict that’s acceptable to all members of the jury,
if you can do so without doing violence to your conscience.”  We find no reason to depart from precedent in
this case, and find no error in the Allen
charge.  Because the trial court did not
err when it gave the Allen charge,
McMorris’s argument that the court erred in denying his motion for a mistrial
based on the charge is without merit. 
McMorris’s second issue is overruled.

Denial
of Motion for New Trial

            McMorris’s final issue
is that the trial court abused its discretion by denying his Motion for New
Trial.[3]  The State argues that McMorris forfeited his challenge
by failing to attack each independent basis supporting the trial court’s ruling
and, alternatively, that the court did not abuse its discretion in denying the
motion for new trial because the juror’s affidavit and letter were not
competent evidence under Rule 606(b) of the Texas Rules of Evidence.

We review a trial court’s denial of a motion
for new trial for an abuse of discretion. 
Webb v. State, 232 S.W.3d 109,
112 (Tex.Crim.App. 2007).  This Court
views the evidence in the light most favorable to the trial court’s ruling and
will uphold the ruling if it was within the zone of reasonable
disagreement.  Id.  We do not substitute our
judgment for that of the trial court, but rather we decide whether the trial
court's decision was arbitrary or unreasonable.  Id.  Thus, a trial court abuses its discretion in
denying a motion for new trial only when no reasonable view of the record could
support the trial court’s ruling.  Id., citing
Charles v. State, 146 S.W.3d 204, 208 (Tex.Crim.App. 2004).

Texas Rule of
Evidence Rule 606(b) states that a juror may not testify or make an affidavit
about any matter or statement occurring during deliberations or the effects of
anything on any juror’s mind as influencing the verdict with two exceptions:  (1) “whether any outside influence was
improperly brought to bear upon any juror,” or (2) “to rebut a claim that the
juror was not qualified to serve.”  “[D]efense counsel has an obligation to ask
questions calculated to bring out that information which might be said to
indicate a juror’s inability to be impartial and truthful.  Unless defense counsel asks such questions,
the material information which a juror fails to disclose is not really
‘withheld.’”  Armstrong v. State, 897 S.W.2d 361, 363-64 (Tex.Crim.App. 1995)[Internal
citation omitted].  In Armstrong, the county attorney
personally prosecuted a murder case.  See id. at 362.  The jury foreperson had been friends with the
county attorney for over twenty-five years.  In addition, the foreperson’s husband and the
county attorney had been each other’s best man at their respective weddings and
the husband was serving as the county attorney’s campaign treasurer during the
trial, having already served in that capacity in a previous campaign.  Id.
at 363.  The foreperson did not reveal
any of this information during voir dire.  Id.
at 362-63.  The prospective jurors were
asked whether any of them were “so well acquainted with” or “acquainted or
associated with” the prosecution staff that it would affect their verdict.  Id.
at 362.  They were also asked whether
they had “any special connection with the County Attorney’s office, perhaps a
close friend in the office, secretary, investigator or the like” and whether
there was anything they could think of that touched on their qualifications to
serve on the case.  Id. at 362-63.  The Court of
Criminal Appeals held that there was no juror misconduct because the jury panel
was not asked “the questions needed to elicit the desired information.”  Id.
at 364.

            Here, after the conclusion
of the trial, juror C.F. submitted a letter to the trial court, the District
Attorney, and the trial prosecutors stating:

Judge,
I do recall you saying outside things should not be discussed while
deliberating and we all should focus on the case.  I remember before the jury was selected the
question was asked if you or any family member was ever raped or sexually
assaulted.  During deliberation one of
the jurors said she was raped/sexually assaulted by a guy in [sic] which she
was introduced by close friends of hers.  She stated she did not want to mention it when
asked by the attorney’s [sic].  I can’t
remember her name but I do remember her face.  (Small thin petite lady, salt/pepper hair,
long pony tail with glasses)  She
went on to tell the entire story how he sexually assaulted her.  She also mentioned other stories that had
nothing to do with this case.  When
questions were asked she would always have a story to tell.  Another juror informed her on numerous
occasions that she should not be discussing outside stories.  I am not sure if the things/stories told by
her influenced/swayed the jurors one way or another but I feel everyone should
have a fair trial . . . I believe it’s my duty and responsibility to tell the
truth and inform you of jury misconduct during deliberations.  [Emphasis in original].

 

            McMorris filed a Motion
for New Trial and a hearing was held on June 23, 2011.  McMorris called juror C.F. to testify but she
did not appear due to a family emergency. 
McMorris offered the letter and an affidavit signed by juror C.F. as
evidence.  The State made no objection to
the admission of either the affidavit or the letter.  No other evidence was presented by McMorris,
and the State offered no evidence.  During
argument, the State raised a Rule 606(b) challenge.[4]  Following the arguments, the trial court
denied the motion for new trial.  In its
oral ruling, the trial court specifically found that:

[T]he
State’s reliance on 606 regarding one juror saying what another juror said in
voir dire is well founded, and the Court does not see how it could ever
consider that evidence absent an allegation of outside influence which has not
been raised in this case.

 

The trial court noted that the questions asked of the jury by counsel
during voir dire were “somewhat vague” as to whether any member of the venire
had been personally sexually assaulted, and that the proper question would be
something along the line of “[i]s there someone here who is a victim of sexual
assault themselves,” or perhaps even a more specific question such that the
members of the venire would understand that counsel was inquiring about their
personal experiences.[5]  The trial court noted that there was no
evidence of which juror may have caused the alleged misconduct, as both
McMorris and the State suggested it was a different juror.  The trial court found that McMorris did not
utilize due diligence in voir dire by asking the questions that the defense
felt needed to be answered in accordance with White v. State, 225 S.W.3d 571, 575-76 (Tex.Crim.App. 2007).

            We do not address the
arguments that McMorris forfeited his right to challenge the trial court’s
ruling that the evidence presented is not competent evidence under Rule 606(b),
or that McMorris did not exercise due diligence in voir dire, as we find no
error in the trial court’s decision.  The
Supreme Court of Texas has held that “while failure to disclose bias is a form
of juror misconduct that justifies a new trial under the appropriate circumstances,
proof of a juror’s failure to disclose bias must come from some source other
than a fellow juror’s testimony about deliberations.”  Golden
Eagle Archery, Inc. v. Jackson, 24 S.W.3d 362, 371 (Tex.2000).  In the instant case, the only evidence
presented was an affidavit and a letter, neither of which identified which
juror failed to disclose material information.  As such, McMorris presented no evidence to
establish proof of a juror’s failure to disclose bias from a source other than
a fellow juror’s testimony, and therefore McMorris cannot prove that misconduct
occurred.  Golden Eagle Archery, Inc., 24 S.W.3d at 372.  The trial court did not abuse its discretion
in denying the motion for new trial. 
McMorris’s final issue is overruled.

CONCLUSION

Having overruled each of McMorris’s issues,
the judgment of the trial court is affirmed.

 

 

 

December
19, 2012

                                                                        CHRISTOPHER
ANTCLIFF, Justice

 

Before
McClure, C.J., Rivera, and Antcliff, JJ.

 

(Do
Not Publish)











[1]
This case was transferred from the Second Court of Appeals to this Court
pursuant to a docket equalization order entered by the Texas Supreme
Court.  See Tex.Gov’t Code
Ann. § 73.001 (West 2005).  We have applied precedent of the Fort
Worth Court of Appeals.  See Tex.R.App.P.
41.3.

 





[2]
Counsel for McMorris requested a
limiting instruction, and the trial court informed counsel what the instruction
would be and that the court would give the instruction when requested, however McMorris
never made such a request during Luna’s testimony.





[3]
McMorris did not direct this Court to substantial authority supporting his
argument, other than citing a case for the standard of review, the Sixth
Amendment, and Tex.Code Crim.Proc.Ann.
arts. 35.15 and 35.16 (West 2006).  Texas
Rule of Appellate Procedure 38.1(i) states that an appellant’s “brief must
contain a clear and concise argument for the contentions made, with appropriate
citations to authorities and to the record.”  Tex.R.App.P.
38.1(i).  Furthermore, as a general rule,
an appellate court will not consider an issue raised by an appellant where the
appellant fails to provide any legal argument to support his claim.  See
Hamilton v. Williams, 298 S.W.3d 334, 337 (Tex.App.--Fort Worth 2009, pet.
denied).  This is so because an issue
unsupported by citation to any legal authority presents nothing for the court
to review.  AMX Enters., L.L.P. v. Master Realty Corp., 283 S.W.3d 506, 525
(Tex.App.--Fort Worth 2009, no pet.). 
While McMorris did not provide this Court with any legal authority in
support of his argument, he did provide citations to the record, and in the
interest of justice we consider his argument.





[4]
No objections were made to the letter or the affidavit.  Accordingly, the testimony and affidavits are
available for our consideration in determining whether reversible error
occurred.  See Salazar v. State, 38 S.W.3d 141, 147-48 (Tex.Crim.App. 2001).





[5]
The trial court determined that counsel’s question “[d]oes anyone know someone
who’s been sexually assaulted” was “somewhat vague.”  During voir dire, after a prospective juror
told of her own experience of having been sexually assaulted, the State asked
“I know that [venireperson K] has shared an experience with us.  Is there anyone else here that knows someone
who was sexually assaulted?”  When
another member of the venire indicated that they knew someone who had been
sexually assaulted, the State followed up with “[y]ou knew someone that was
sexually assaulted?”  Following
additional questions, the State asked the panel:  “Anybody else know somebody that was sexually
assaulted?;” “Anybody else know somebody that was accused or know a victim of
sexual assault?  I’ll expand the question;”
[to a venriperson] “You know someone that was sexually assaulted or accused?;”
“Anybody over here know someone that’s been sexually assaulted or
accused?”  Neither party ever
specifically inquired of the venire as to whether they had personally been the
victim of a sexual assault.